IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

KUZHIKALAYIH MATHEWS
aka Samuel "Sam" Mathews,

                              Plaintiff,

v.                                                         Case No. 2:16-CV-1148-MAK

UNIVERSITY OF PITTSBURGH PHYSICIANS
aka UPP, INC,

                              Defendant.

**DEFENDANT'S CONCISE STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.B.1, Defendant submits this concise statement of material undisputed facts in support of Defendant's Motion for Summary Judgment. These facts are assumed to be true solely for the purpose of Defendant's motion, and are not admissions by Defendant for any other purpose. Defendant has submitted an Appendix in Support of Motion for Summary Judgment.[1]

1.       Plaintiff was hired as a Financial Analyst II in late December 2001 for the Pediatrics Department of UPMC Children's Hospital. *Mathews Depo. Tr. P11/L23-L24 [App 160].* Plaintiff worked in that position and department doing largely the same work until 2012, when he was promoted to Intermediate Financial Analyst. *Mathews Depo. Tr. P30/L2-L5 [App 165].* Plaintiff had two or three supervisors from 2001 to 2009, but in 2009 he began reporting to Paula

---

[1] The individual record items are listed at the beginning of the Appendix and appear behind numbered tabs in the Appendix. The Appendix pages have been numbered sequentially. Citations to the record in this Statement of Facts appear in italics and refer to the record items by name and internal page or paragraph number, as well as the Appendix page numbers.

Hutson when she replaced Plaintiff's previous supervisor.   *Mathews Depo. Tr. P34/L14-L20 [App 166]*.   Paula Hutson was Plaintiff's manager until about July 2013.   *Mathews Depo. Tr. P35/L9-L12 [App 166]*.

2.      Janet Storer is currently retired from full-time employment, but prior to Storer's March 2016 retirement she was Manager of Finance for the Departments of Orthopedic Surgery and Pediatrics for UPP, the defendant in this lawsuit.   Storer held that position and similar positions for UPMC for about twelve years, including a period in 2013 to 2014 when Storer was the manager for Sam Mathews.   Janet Storer is sixty years old.   *Storer Affidavit ¶ 1, [App 149]*.

3.      John Kunicky has been a human resources professional for about fourteen years, working in several companies in the United States, and has been employed in that role by UPMC for about eleven years.   Kunicky is in charge of a human resources group within UPMC that serves approximately 11,000 employees.   *Kunicky Affidavit ¶ 1, [App 79]*.

4.      In 2013 and 2014 Brian Fritz's office was in the Forbes Tower in the Oakland neighborhood of Pittsburgh, a few blocks from the Kaufmann Building where Janet Storer's office was located at that time.   The Forbes Tower and the Kaufmann Building are about three miles from UPMC Children's Hospital in the Lawrenceville neighborhood of Pittsburgh, where Paula Hutson was at the same time, and where Sam Mathews was located for several years prior to 2014. *Fritz Affidavit ¶ 2, [App 2]*.

5.      Brian Fritz has overall responsibility for the finances of the clinical departments of Defendant UPP, Inc., and he manages the financial analysts and the finance services provided internally for UPP.   UPP is the organization within UPMC that provides healthcare services through physician practice groups in various medical specialities.   It is sometimes referred to as the Physician Services Division.   *Fritz Affidavit ¶ 3, [App 3-4]*.

6.      In April 2013, UPMC announced the restructuring of the finance function across its organizations and entities.   Part of the restructuring was to consolidate the finance function and services into a single organization that served the various UPP and UPMC departments, but that would have a centralized and streamlined management throughout the UPMC organization. Previously, the finance function and the financial analysts and their managers reported separately to the business or medical units they served.   *Fritz Affidavit ¶ 4, [App 3]*.

7.      One of the objectives of the restructuring was to provide more independence for the financial analysts from the management of the various business and medical groups, and to provide a more consistent level of excellence, productivity, and service from the financial analysts across the UPP and UPMC organizations.   *Fritz Affidavit ¶ 5, [App 3]*.

8.      The restructuring initially organized the financial analysts and other finance employees into "pods" that reported centrally up through the Finance Department management, but that were assigned to serve specific groups within UPP and UPMC.   *Fritz Affidavit ¶ 6, [App 3]*.

9.      Over the two months following the announcement, financial analysts were required to re-apply and interview for their jobs, and they were encouraged to apply for other jobs within and without UPMC as well.   This was because the restructuring was expected to eliminate a number of positions for financial analysts and other employees, so a number of people were expected to lose their jobs.   *Fritz Affidavit ¶ 7, [App 3]*.

10.      As part of the restructuring, the finance groups for the Pediatrics and Orthopedic Surgery Departments within UPP, Inc. were merged into a single pod, and Janet Storer was selected to be the manager for the Ortho/Peds Finance Pod.   Paula Hutson previously had managed finance for the Pediatrics Department and Janet Storer previously had managed the

function for the Orthopedic Surgery Department.  *Fritz Affidavit ¶ 8, [App 3-4]; Storer Affidavit ¶ 2, [App 149]*.

11.     Also as part of the same restructuring, Brian Fritz was appointed Senior Director of Finance for the Health Services Division and given charge of the Ortho/Peds Finance Pod as well as a number of other Finance pods.  *Fritz Affidavit ¶ 9, [App 4]*.

12.     All of the financial analysts who had worked in Pediatrics and Orthopedic Surgery prior to the restructuring were required to apply and interview anew for their jobs, and as the manager for the combined Ortho/Peds Finance Pod, Janet Storer interviewed the employees and selected those who would continue to work for her new group in the Pediatrics/Orthopedics Pod. *Fritz Affidavit ¶ 10, [App 4]*.  Janet Storer interviewed Sam Mathews in April or May 2014 and hired him to work in the new finance group.  *Storer Affidavit ¶ 3, [App 149-50]*.

13.     After the June 2013 restructuring, both Sam Mathews and Paula Hutson reported to Janet Storer, but Mathews continued to work at Children's Hospital, for the most part doing the same job he had been doing for several years and continuing to be supervised by Paul Hutson for his day to day work.  This continued for about six months, until the beginning of 2014, when Mathews was transferred to the Kaufmann Building in Oakland.  *Fritz Affidavit ¶ 11, [App 4]; Storer Affidavit ¶ 4, [App 150]*.

14.     Brian Fritz's first direct involvement with Sam Mathews was in January 2014, shortly after Kathy Osterrieder unexpectedly announced she would retire within a matter of weeks. Kathy worked for Janet Storer in the Kaufmann Building.  Ms. Storer needed to reassign Osterrieder's duties right away so Osterrieder could do training before her retirement.  Ms. Storer selected Sam Mathews to take over some of those duties, which required a move to the Kaufmann Building.  Mathews had been an Intermediate Financial Analyst for about two years, and he had

been working in the Pediatrics Department at Children's for over ten years.   Janet Storer and Brian Fritz both expected Mathews should be able to learn at least some of Osterrieder's duties relatively quickly and they agreed to make that move.   *Fritz Affidavit ¶ 12, [App 4]; Storer Affidavit ¶ 5, [App 150]*.

15.     Janet Storer moved Sam Mathews shortly after that and asked Kathy Osterrieder to begin training Mathews.   Not long afterward, Janet Storer reported to Brian Fritz that Ms. Osterrieder had tried for several days or maybe a week to train Mathews on some of Osterrieder's duties, but realized Mathews lacked certain core competencies for financial analysts and he would not be able to gain those skills or learn any of her primary duties within the short time before she retired.   *Fritz Affidavit ¶ 13, [App 5]; Storer Affidavit ¶ 6, [App 150]*.

16.     Consequently, Janet Storer assigned Jeff Martin to take over the Osterrieder duties initially given to Mathews, and moved Mathews to take over Jeff Martin's job.   *Fritz Affidavit ¶ 14, [App 5]; Storer Affidavit ¶ 7, [App 150-51]*.

17.     Jeff Martin had recently been moved from Pediatrics at Children's Hospital to the Kaufmann Building to take over Pam Walsh's job for the Orthopedic Surgery group.   Ms. Walsh had worked for Janet Storer for a number of years in Orthopedics, but as part of the 2013 restructuring, Walsh was moved to a new job in a different location and Jeff Martin was moved into Walsh's old job.   *Fritz Affidavit ¶ 15, [App 5]; Storer Affidavit ¶ 7, [App 150-51]*.

18.     Kathy Osterrieder then trained Jeff Martin on her job duties, and she reported to Janet Storer that Martin caught on quickly and would be able to handle those duties well.   Martin in fact did take over those duties and handled them successfully.   *Storer Affidavit ¶ 8, [App 151]*.

19.     The Walsh/Martin job duties were of a lower grade and complexity, and required a lower skill set for a financial analyst, so Janet Storer hoped Sam Mathews would be able to perform

those duties.   Ms. Storer discussed that move with Brian Fritz as well, and Fritz agreed it was a good solution for the time being.   *Fritz Affidavit ¶ 16, [App 5]; Storer Affidavit ¶ 9, [App 151]*.

20.     Because Jeff Martin was being trained by Kathy Osterrieder on Kathy's job duties, Janet Storer asked Brian Fritz by email dated January 23, 2014, if Pam Walsh could come back to the Kaufmann Building to train Sam Mathews on the Walsh/Martin job duties, and Fritz agreed. *Fritz Affidavit ¶ 17, [App 5]; Fritz Affidavit Exh. A [App 15]; Storer Affidavit ¶ 11, [App 151]*.

21.     Sam Mathews reacted angrily and vehemently to his reassignment from the Osterrieder duties to Jeff Martin's and Pam Walsh's old job.   This was the beginning of a long series of very difficult months and very angry encounters with Mathews for Janet Storer. Mathews seemed deeply offended or angry that Storer had switched Mathews from doing the Osterrieder duties to doing Jeff Martin's job.   Storer did not know why Mathews was so upset about this, except that the Martin/Walsh job involved lower level duties, but Mathews reaction was way out of proportion to what Storer would have expected.   *Storer Affidavit ¶ 10, [App 151]*.

22.     After trying to train Sam Mathews in the Kaufmann Building, Pamela Walsh told Brian Fritz and Janet Storer that Mathews had been uncooperative and unwilling to listen to Walsh or receive any instruction on Walsh's old job duties.   Walsh said, basically, it was a waste of her time and that, while she would provide ongoing telephone and email instruction for Mathews if requested, Walsh did not want to go back to Kaufmann to help Mathews in person, as she thought it would again be a waste of her time.   *Fritz Affidavit ¶ 18, [App 5]; Storer Affidavit ¶ 12, [App 151-52]*.

23.     Over the course of the following three or four months, Janet Storer reported to Brian Fritz about ongoing problems with Sam Mathews' job performance and his behavior toward Storer.   In particular, Storer reported that Sam was constantly argumentative and uncooperative

with Storer regarding his job duties and areas where Storer felt Mathews needed to improve, mistakes he needed to avoid, and tasks he seemed unable to perform without assistance from Storer or others.  *Fritz Affidavit ¶ 19, [App 6]; Storer Affidavit ¶ 13, [App 152].*   Storer also believed Mathews was dishonest on one or more occasions about things Mathews had done or failed to do. *Storer Affidavit ¶ 13, [App 152].*

24.     Sam Mathews always seemed to have an excuse or explanation, but it always seemed to miss the main point of what Janet Storer was trying get him to do or not to do.   Because of that, it took up an inordinate amount of Storer's time and energy just to try to show Mathews he was missing the point, but also to fend off Mathews' anger and vehemence toward Storer.   It was exhausting, and at times even frightening for Storer.   Sometimes Mathews' anger was so intense that he would be visibly trembling, and there were one or two occasions when Storer actually feared for her own safety.   Storer believed Mathews was trying to intimidate her into backing down and just letting Mathews off the hook for his poor performance.  *Storer Affidavit ¶ 14, [App 152].*

25.     In or about May 2014, Janet Storer talked to Meghann Ledford about the problems with Sam Mathews.   Ledford was the Human Resources Consultant who provided HR support for Storer's group.  *Storer Affidavit ¶ 16, [App 152-53].*

26.     Storer's problems with Mathews reached a point in May 2014 when Brian Fritz felt he needed to terminate Mathews' employment or take other strong steps to resolve the situation. Mathews had become a great burden on Storer's time and energies, and their relationship had become so acrimonious that it was an emotional strain on Storer, and Fritz was concerned it would begin to harm the department and seriously impede Storer in doing her work.  *Fritz Affidavit ¶ 20, [App 6]; Storer Affidavit ¶ 15, [App 152].*

-7-

27.     Brian Fritz had confidence in Janet Storer as a manager and as a finance professional, and Fritz believed Storer was doing her best with a difficult situation, but it appeared to Fritz to have become so acrimonious that Fritz needed to elevate it to his level and that of John Kunicky on the HR side to be sure the investigation and decisions were made outside and above the rancor.   Consequently, Brian Fritz got more directly involved and began to take direct responsibility for guiding the resolution.   *Fritz Affidavit ¶ 21, [App 6]; Storer Affidavit ¶ 15, [App 152]*.

28.     It was unusual for Brian Fritz to get directly involved with an individual employee's performance issues.   Most of the time performance problems were handled by the individual managers, who might consult with Fritz from time to time, but Fritz did not normally get directly involved as he did in the Sam Mathews situation, and he did not commonly seek direct input from senior level Human Resources people such as John Kunicky and Michael Anderson, or business unit executives such as Andrea Badway.   *Fritz Affidavit ¶ 22, [App 6]*.

29.     Brian Fritz undertook to investigate and evaluate the situation involving Sam Mathews.   This included soliciting and reviewing information, materials, and advice and assessment from Meghann Ledford, Paula Hutson, Janet Storer, Andrea Badway, Kathy Osterrieder, and Pamela Walsh, as well as information, materials, and other input from Sam Mathews.   It also included seeking the direct involvement and independent investigation and advice of senior level Human Resources people.   It also included a number of telephone and in-person conversations with John Kunicky, Andrea Badway, Meghann Ledford, Janet Storer, and Paula Hutson, and one or more meetings with Sam Mathews.   *Fritz Affidavit ¶¶ 23, 43 [App 6]*.

30.     Brian Fritz also personally observed Sam Mathews in at least one meeting and in his correspondence, and Fritz examined the materials and arguments Mathews submitted in his

own defense on the PIP and his job performance, as well as Mathews' claims at that time regarding Janet Storer.   Fritz concluded that those arguments were for the most part either in error or misleading, and in any event, not enough to warrant overriding the judgment of all the individuals Fritz had consulted.   *Fritz Affidavit ¶ 25, [App 7].*

31.   On May 12, 2014, Janet Storer sent an email to Paula Hutson and to Brian Fritz in which Storer asked Hutson to provide information to Fritz regarding Sam Mathews' performance. This email included an attachment which was Janet Storer's assessment and report to Brian Fritz regarding Sam's performance deficiencies and uncooperativeness up to that point.   *Fritz Affidavit ¶ 26, [App 7]; Fritz Affidavit Exh. B [App 17].*

32.   On May 13, 2014, Paula Hutson and Brian Fritz exchanged emails in response to Janet Storer's request of the previous day.   As shown in this exchange, Fritz was not pleased with what Fritz took to be Hutson's effort to excuse the concerns Hutson had identified regarding Mathews' performance.   In Fritz's response to Hutson he expressed some of his own concerns at that time about Mathews' role in the restructured department, and whether Mathews was contributing as expected in the new environment.   *Fritz Affidavit ¶ 27, [App 7-8]; Fritz Affidavit Exh. C [App 23]*

33.   John Kunicky's first direct involvement with Sam Mathews was in May 2014 when Brian Fritz contacted Kunicky by email to ask for Kunicky's advice and assistance in dealing with Sam Mathews.   Fritz sent an email on May 12, 2014, to Kunicky and to HR Vice President Michael Anderson asking for this advice and assistance.   *Kunicky Affidavit ¶ 2, [App 79-80]; Kunicky Affidavit Exh. A [App 85]; Fritz Affidavit ¶ 28, [App 8]; Fritz Affidavit Exh. D, [App 26].*

34.   At Brian Fritz's request, John Kunicky got directly involved in the Sam Mathews matter from a Human Resources standpoint.   Fritz and Kunicky were at similar levels in their

respective organizations within UPMC, so when Fritz elevated the Sam Mathews matter to his level, it was natural for him elevate it on the Human Resources side to Kunicky.   *Kunicky Affidavit ¶ 3, [App 80].*

35.     Brian Fritz and John Kunicky spoke by telephone on several occasions over the following months as Fritz tried to work through the significant conflict and performance problems Fritz and his direct report, Janet Storer, were having with Sam Mathews.   This included the development and implementation of a Performance Improvement Plan (PIP) for Mathews, and when that proved unsuccessful, the termination of Mathews' employment at the end of July 2014. *Kunicky Affidavit ¶ 4, [App 80].*

36.     John Kunicky discussed the Sam Mathews matter at some length with Meghann Ledford, his direct report and a Human Resources Consultant who had been working on the matter. Kunicky also asked Meghann to solicit and gather documents and other materials from Sam Mathews, Janet Storer, Paula Hutson, and others involved so Kunicky could review the matter independently and be able to give advice and assistance to Brian Fritz on how to handle the situation.   *Kunicky Affidavit ¶ 5, [App 80].*

37.     John Kunicky undertook to investigate and evaluate the situation involving Sam Mathews.   This included Kunicky reviewing materials and information from Sam Mathews, Janet Storer, Paula Hutson, and Meghann Ledford, assisting in the development and implementation of the PIP for Sam Mathews, reviewing reports of Mr. Mathews' reaction and response to the PIP, and reviewing the efforts of Meghann Ledford, Janet Storer, Paula Hutson, and Brian Fritz to help Mathews through the PIP.   *Kunicky Affidavit ¶ 6, [App 80].*

38.     May 2014, based on advice from John Kunicky, Janet Storer and Meghann Ledford began to work on a Performance Improvement Plan for Sam Mathews to try to get Mathews turned

around and correct his substantive performance problems and his inability to cooperate with Storer. *Storer Affidavit ¶ 17, [App 153].*

39.     Over several weeks in May and June 2014, Janet Storer worked with Meghann Ledford on several drafts of a written PIP document for Sam Mathews, and Brian Fritz and John Kunicky reviewed and worked on these drafts, providing their advice and input.   Storer and Ledford also asked Paula Hutson for her input and assistance on the PIP and in dealing with Sam. *Storer Affidavit ¶ 18, [App 153].*

40.     On June 6 and 11, Brian Fritz, Janet Storer, and Meghann Ledford, had an email exchange that shows Fritz' ongoing involvement in pressing to get the PIP finalized and implemented, and asking to be kept apprised of its progress.   The earliest email in the exchange, dated May 22, 2014, is an email from Janet Storer to Meghann Ledford and Brian Fritz regarding Storer's frustrations with the PIP documents.   Specifically, that Storer felt Ledford was removing salient information about Mathews' performance and behavior deficiencies, and with the PIP process in general.   Brian Fritz believed Storer's concerns were legitimate, but he and Ledford were trying to focus the PIP items and criteria on objective performance criteria that would be easy to measure and to demonstrate to Sam.   *Fritz Affidavit ¶ 29, [App 8]; Fritz Affidavit Exh. E [App 28].*

41.     Janet Storer, Meghann Ledford, Brian Fritz, and John Kunicky finalized the PIP documents in early June, and Ledford and Storer met with Sam on June 12, 2014, to introduce the PIP and begin the process called for in the PIP.   Mathews reacted angrily and argumentatively to the whole idea of a PIP, and from that point forward, he seemed to spend all his time fighting about the PIP itself, rather than trying to improve his performance or even to show that he wanted to improve his performance.   *Storer Affidavit ¶ 19, [App 153].*

42.     John Kunicky reviewed, approved, and signed the Performance Improvement Plan for Sam Mathews, dated June 12, 2014, and Kunicky also participated in its preparation by reviewing previous drafts of the document from Meghann Ledford and Janet Storer and consulting with them as they worked through to finalize the PIP.  *Kunicky Affidavit ¶ 7, [App 80-81]; Kunicky Affidavit Exh. B [App 87].*

43.     Brian Fritz reviewed and approved the Performance Improvement Plan dated June 12, 2014, for implementation with Sam Mathews.  *Fritz Affidavit ¶ 30, [App 8]; Fritz Affidavit Exh. F [App 31].*

44.     On June 15, 2014, Sam Mathews sent an email to Brian Fritz asking to meet with Fritz personally to discuss Mathews' PIP.  The same exhibit shows Fritz's email to Meghann Ledford and Janet Storer expressing Fritz's willingness to meet with Mathews personally, but also Frtiz's concerns about meeting without witnesses to verify the discussions.  *Fritz Affidavit ¶ 31, [App 8]; Fritz Affidavit Exh. G [App 36].*

45.     On June 16, 2014, Sam Mathews and Brian Fritz had an email exchange which shows Mathews' request for a meeting and then subsequent exchanges between Fritz and Mathews, in which Fritz let Mathews know that Fritz would meet with Mathews and in which Fritz tried to offer encouragement for Mathews to work with Fritz and with Janet Storer and Paula Hutson to focus on performance improvement, instead of arguing about or challenging the PIP itself.  *Fritz Affidavit ¶ 32, [App 8-9]; Fritz Affidavit Exh. H [App 38].*

46.     On June 18, 2014, Brian Fritz and Janet Storer had an email exchange in which Storer reported on continuing difficulties with Sam Mathews' unwillingness to embrace and work through the PIP, rather than argue about the PIP, as well deficiencies in Mathews' capabilities on certain core competencies that are expected of any financial analyst at any level.  In Fritz's

response to Storer, Fritz expressed his concerns about Mathews' core competency as a financial analyst. *Fritz Affidavit ¶ 33, [App 9]; Fritz Affidavit Exh. I [App 41].*

47.    On June 24, 2014, Janet Storer sent an email to Brian Fritz in which she forwarded a report from Paula Hutson of the same date on Paula's meeting with Sam Mathews that morning. Paula described her efforts to train Mathews on certain tasks that he was being asked to perform. In Fritz's judgment, Fritz believed Mathews should not have needed training on the items described in Hutson's report.   At his level, as an Intermediate Financial Analyst, Mathews should have already known how to do these things, or at the very least should have been able to figure them out on his own. *Fritz Affidavit ¶ 34, [App 9]; Fritz Affidavit Exh. J [App 43].*

48.    On July 9, 2014, Janet Storer sent an email to Brian Fritz in which Storer reported to Fritz on the events of the mid-point meeting of the PIP with Sam Mathews, Meghann Ledford, and Paula Hutson.   Storer again expressed her frustration with the PIP process and the way Storer was being treated. *Fritz Affidavit ¶ 35, [App 9]; Fritz Affidavit Exh. K [App 45].*

49.    On July 10, 2014, Brian Fritz sent an email to Paula Hutson, and below that on the same page is Paula Hutson's email to Fritz of the previous day reporting on the July 9 mid-point PIP meeting with Sam Mathews, Janet Storer, and Meghann Ledford.   Hutson expressed her deep concerns about Mathews' behavior and his unwillingness to cooperate with the PIP or to take seriously his obligation to respond in a constructive and cooperative way to the requirements of the PIP.   Hutson reported, that Mathews seemed entirely focused on his fundamental disagreement with the fact that he was on a PIP to begin with. *Fritz Affidavit ¶ 36, [App 9-10]; Fritz Affidavit Exh. L [App 48].*

50.    On July 10, 2014, Meghann Ledford sent an email to Mike Anderson and John Kunicky about the July 9 mid-point meeting for Sam Mathews' PIP and about Mathews' behavior

-13-

in that meeting, and Kunicky responded to Ledford's report the same day.   *Kunicky Affidavit ¶ 8, [App 81]; Kunicky Affidavit Exh. C [App 92].*

51.     On July 11, 2014, Janet Storer forwarded an email to Brian Fritz from Paula Hutson in which Hutson provided the reports of Pamela Walsh regarding Walsh's efforts to train Sam Mathews on Walsh's job duties the previous January.   *Fritz Affidavit ¶ 37, [App 10]; Fritz Affidavit Exh. M [App 50].*

52.     On July 14, 2014, Brian Fritz sent an email to John Kunicky to inform Kunicky that Andrea Badway wanted to participate in the discussions regarding Sam Mathews.   Ms. Badway was the Executive Administrator in charge of the Orthopedic Surgery group that Sam Mathews was serving at that time, and where Mathews was physically located.   Mathews' workstation was close to Ms. Badway's office and she was able to observe Mathews on a regular basis.   Ms. Badway asked to be included in the discussions because of her observations of Mathews and the impact he had on her group.   *Kunicky Affidavit ¶ 9, [App 81]; Kunicky Affidavit Exh. D [App 94].*

53.     On July 14, 2014, Brian Fritz sent an email to John Kunicky, in which Fritz forwarded Paula Hutson's report on the July 9 mid-point meeting for the Mathews PIP and Mathews' behavior in that meeting, and Hutson's assessment of Mathews' progress on the PIP. *Kunicky Affidavit ¶ 10, [App 81]; Kunicky Affidavit Exh. E [App 96].*

54.     On July 14, 2014, Meghann Ledford sent an email to John Kunicky providing a status report on the Mathews PIP and Mathews' progress.   *Kunicky Affidavit ¶ 11, [App 81]; Kunicky Affidavit Exh. F [App 98].*

55.     On July 14, 2014, Janet Storer sent an email to John Kunicky forwarding Storer's previous report to Brian Fritz on the July 9 mid-point meeting for the Mathews PIP and Mathews' behavior in that meeting.   *Kunicky Affidavit ¶ 12, [App 81]; Kunicky Affidavit Exh. G [App 100].*

56.     On July 14, 2014, Janet Storer sent an email to John Kunicky, following up on an earlier telephone call about the Sam Mathews situation, and enclosing a copy of Storer's meeting notes from the July 9 mid-point meeting for the Mathews PIP.   *Kunicky Affidavit ¶ 13, [App 81]; Kunicky Affidavit Exh. H [App 103].*

57.     On July 14, 2014, Paula Hutson sent an email to John Kunicky providing Hutson's account of the events at the July 9 mid-point meeting for the Mathews PIP, and Hutson's assessment of Mathews' reaction to the PIP and lack of progress.   *Kunicky Affidavit ¶ 14, [App 82]; Kunicky Affidavit Exh. I [App 106].*

58.     On July 14, 2014, Meghann Ledford sent an email to John Kunicky in which she forwarded an email from Sam Mathews and about thirty pages of attachments in which Mathews sets forth his arguments and supporting documents in defense of his job performance and against the PIP.   Kunicky reviewed all of these materials personally, and considered all of them in assessing how best to proceed with the Mathews PIP and Mathews' employment.   *Kunicky Affidavit ¶ 15, [App 82]; Kunicky Affidavit Exh. J [App 108].*

59.     On July 16, 2014, Brian Fritz, Janet Storer, John Kunicky, had an email exchange in which Storer asked for an update on John Kunicky's investigation, and Kunicky reported that he is "waiting on 1 more statement.   Once we receive that I will make a recommendation."   *Fritz Affidavit ¶ 38, [App 10]; Fritz Affidavit Exh. N [App 63]; Kunicky Affidavit ¶ 16, [App 82].*

60.     On July 16, 2014, Meghann Ledford sent an email to John Kunicky, in which Ledford forwarded Sam Mathews' statement regarding the July 9 mid-point meeting for Mathews' PIP.   Kunicky reviewed this statement and considered it in assessing how best to proceed with Sam's PIP.   *Kunicky Affidavit ¶ 17, [App 82]; Kunicky Affidavit Exh. L [App 141].*

61.     Throughout the PIP, Sam Mathews did the same things he had been doing with

Janet Storer for the previous few months, only it was magnified somewhat because it was with Meghann Ledford, Paula Hutson, and Brian Fritz.   That is, Mathews was not trying to correct problems that were pointed out to him, but just attacking Storer and arguing vehemently over unimportant details.   It appeared as if Mathews was just trying to distract people from the central fact of his poor performance.   *Storer Affidavit ¶ 20, [App 153]*.

62.      Sam Mathews was so angry and argumentative that he couldn't seem to see that he was harming himself and ruining his own chances of succeeding in the PIP.   Mathews was missing the whole point of the PIP—which was for him to learn to cooperate with his manager and get his projects done properly and timely and without relying on others to help him do his job. *Storer Affidavit ¶ 25, [App 154]*.

63.      Brian Fritz met with Sam Mathews as Mathews had requested in mid-June, shortly after the PIP was started, and went over Mathews' situation at length and in detail.   Fritz reviewed the lengthy written materials Mathews had submitted to Fritz, and the two of them went over the materials point-by-point.   Fritz found Mathews to be almost obsessed with arguing over details that were not important to Mathews' overall performance deficiencies, and refusing to come to grips with the fact that Mathews needed to cooperate with Janet Storer and Paula Hutson and with Fritz to demonstrate that Mathews wanted to improve his own performance.   *Fritz Affidavit ¶ 44, [App 11]*.

64.      Brian Fritz came away from his meeting with Sam Mathews with the clear impression that Mathews was not trying to improve his own performance, but was trying to prove Janet Storer wrong—that it had become a personal contest for Mathews against Storer.   It appeared to Fritz that the conflict so possessed Mathews that Mathews could not see past it to his own best interests, which were to try to improve his own performance.   Mathews was completely

missing the larger point of the PIP, which was for Mathews to learn to cooperate with his manager and get his projects done properly and timely—and without burdening his manager or others with having to help him do his job.   *Fritz Affidavit ¶ 45, [App 11].*

65.    Sam Mathews' kept saying during this process that he needed training and that Janet Storer was refusing to give him vital data or instructions for doing his job.   However, Brian Fritz had a lot of confidence in Janet Storer both as a manager and as a finance professional, and Fritz found it entirely unbelievable that Storer would deliberately withhold information or instructions that one of her subordinates legitimately needed.   *Fritz Affidavit ¶ 46, [App 12].*

66.    When Brian Fritz examined Sam Mathews' arguments and the written materials Mathews had sent to Fritz, and the information and materials Fritz received from Janet Storer and Paula Hutson, it was clear to Fritz that the things Mathews claimed to need training on, were things that Mathews should not have needed to be trained on.   They were basic skills for a financial analyst at Mathews' level, and if Mathews needed training on them, then he was in the wrong job and the wrong department.   In addition, when Fritz examined Mathews' claims about information Mathews said he needed or was being withheld, Fritz found it was information Mathews should have been able to find or develop himself, and should not have been relying on or bothering a manager to provide, or blaming his manager for not providing it.   *Fritz Affidavit ¶ 47, [App 12].*

67.    Janet Storer generally found that the things Sam Mathews claimed to need training on, were things he should already have known how to do at his level, or he should have been able to figure out for himself.   Mathews' approach, instead, seemed to be to just throw up his hands, so to speak, rather than digging in to figure out how to do things.   Then, when asked why he hadn't completed something, Mathews would say he needed training on some aspect of the job. *Storer Affidavit ¶ 22, [App 154].*

-17-

68.     When Sam Mathews claimed he didn't have information that was necessary to complete a task, Janet Storer usually found it was information Mathews should have been able to find or develop himself.   Instead, Mathews tended to just claim he didn't have the information, and use that as an excuse for not completing the task.   *Storer Affidavit ¶ 23, [App 154].*

69.     A big part of being a skilled financial analyst, especially at the intermediate level, is being able to figure out how to do things, or to figure out how to find or develop things.   Sam Mathews' approach of asking his manager or a coworker, or just giving up and not completing the task, instead of digging in to figure things out, was contrary to the analytical skills that financial analysts in UPP's restructured department needed to have and to exercise, and Mathews just did not have this, or he was so caught up in his anger that he would not exercise it.   *Storer Affidavit ¶ 24, [App 154].*

70.     Brian Fritz understood that John Kunicky reviewed anew the pertinent materials regarding Sam Mathews, and that Kunicky solicited input directly from Mathews and others through Meghann Ledford, and that Kunicky evaluated them and made his own independent judgments about how to deal with Mathews.   Kunicky then gave his advice and recommendations to Fritz.   Fritz ended up consulting with Kunicky several times about Mathews, and Fritz relied on Kunicky's advice and recommendations.   *Fritz Affidavit ¶ 48, [App 12].*

71.     Brian Fritz sought the input of Paula Hutson, who had supervised Sam Mathews for several years, and who did not experience the hostility that Janet Storer encountered with Mathews.   Hutson reported basically the same thing that Janet Storer and Meghann Ledford reported about the PIP and Mathews' behavior—which was that Mathews was spending his energies fighting and arguing about the PIP and criticizing Janet Storer, and Mathews simply wasn't trying to complete the PIP successfully.   *Fritz Affidavit ¶ 51, [App 13].*

72.     Ultimately, Brian Fritz concluded that Sam Mathews had never accepted that the PIP was needed, so Mathews refused to cooperate in it, or he was not capable of doing what was being asked, so Mathews masked that inability by being argumentative and hostile with Janet Storer.   Brian Fritz could not tell for sure which of those options it was, but in either event, it was clear to Fritz that Mathews could not continue to work in the department as a financial analyst, so Fritz decided Mathews had to be discharged.   *Fritz Affidavit ¶ 52, [App 13].*

73.     Sam Mathews' inability to perform or quickly learn the duties that Kathy Osterrieder had tried to show him in January 2014, his refusal to cooperate with Pam Walsh when she was trying to train him to take over her old job duties in January 2014, his specific performance failures reported to Brian Fritz by Janet Storer and Paula Hutson, and shown in the PIP documents, and Mathews' argumentative, hostile, angry manner of dealing with Janet Storer, separately were very significant problems for his managers and others.   *Fritz Affidavit ¶ 53, [App 13]; Storer Affidavit ¶ 26, [App 154-55].*   Any one of those things would have been sufficient, in and of itself, to warrant Mathews' discharge.   Taken together, they really left Brian Fritz with no other choice but to discharge Mathews.   *Fritz Affidavit ¶ 53, [App 13].*

74.     Sam Mathews always seemed to have an excuse or explanation, but it always seemed to miss the point.   In that manner, it took up time and energy and effort of everyone involved, just to try to show Mathews that he was missing the point.   That exhausting way in which Mathews dealt with his own performance problems also was sufficient, in and of itself, to warrant Mathews' discharge.   Mathews simply used too many resources, in terms of the time, energy, and patience of his managers, so that he compounded his own substantive performance deficiencies.   *Fritz Affidavit ¶ 54, [App 13-14].*

75.     Every individual Brian Fritz consulted during his investigation and oversight of the

PIP, and every individual who investigated the matter, ultimately determined and advised Fritz that the appropriate and prudent course of action was to terminate Sam Mathews' employment for poor performance that consisted of a combination of Mathews' failure to do what he was asked to do, his combative and argumentative approach to his performance problems and the Performance Improvement Plan, and what Fritz came to believe was Mathews' lack of necessary technical skills to perform to the expectations Fritz had set for the reorganized Finance group.   *Fritz Affidavit ¶ 24, [App 7].*

76.     Brian Fritz reviewed and approved the Performance Improvement Plan Conclusion Document, dated July 28, 2014, showing the conclusion of the PIP was for termination of employment and providing a summary of reasons for that conclusion.   Brian Fritz agreed with the conclusion and its summary of reasons.   *Fritz Affidavit ¶ 39, [App 10]; Fritz Affidavit Exh. O [App 65].*

77.     On July 28, 2014, Brian Fritz sent an email to John Kunicky and Meghann Ledford, stating that Fritz was ready to move forward with terminating Sam Mathews' employment and asking Kunicky and Ledford for their final advice and recommendations.   Kunicky and Ledford advised Fritz that they supported termination of employment based on their investigation and review.   *Fritz Affidavit ¶ 40, [App 10]; Fritz Affidavit Exh. P [App 68]; Kunicky Affidavit ¶ 18, [App 82]; Kunicky Affidavit Exh. M [App 143]*

78.     On July 29, 2016, Meghann Ledford sent an email to Brian Fritz with the final termination papers prepared by Ledford for Fritz to approve Sam Mathews' discharge.   This included the Discharge Authorization Form and termination letter.   Fritz reviewed these papers, including the underlying reasons for the discharge, and signed and gave the final approval for the discharge.   This had already been signed by HR Vice President Michael Anderson, HR Director

John Kunicky, and HR Consultant Meghann Ledford.  *Fritz Affidavit ¶ 41, [App 10-11]; Fritz Affidavit Exh. Q [App 70].*

79.     The final Discharge Authorization form for Sam Mathews' discharge, dated July 29, 2014, was signed and approved by Brian Fritz, HR Vice President Michael Anderson, HR Director John Kunicky, and HR Consultant Meghann Ledford.  *Fritz Affidavit ¶ 42, [App 11]; Fritz Affidavit Exh. R [App 75]*; *Kunicky Affidavit ¶ 19, [App 82]; Kunicky Affidavit Exh. N [App 145].*

80.     Replacing an employee is a very costly endeavor, so UPP makes every effort to resolve conflicts and misunderstandings, and to rehabilitate job performance, of employees who find themselves not performing as expected.   It is ordinarily much easier and much less costly to rehabilitate an existing employee than to find, hire, train, and assimilate a new employee.   That is the pragmatic business reason for having a Performance Improvement Plan for employees who are having job performance or behavior problems at work.  *Kunicky Affidavit ¶ 21, [App 83].*

81.     The objective of a PIP is not to completely cure performance problems in forty-five days.   That rarely can be accomplished.   The objective is to help an employee recognize that he or she needs to improve, understand how he or she needs to improve, and provide a concrete path for beginning to correct the problems and improve performance.   What UPP looks for during a PIP is a recognition by the employee that there is a problem, and then sufficient change and improvement to warrant the belief that the employee eventually can return to or achieve full and satisfactory job performance.  *Kunicky Affidavit ¶ 22, [App 83].*   That is what UPP tried to do with Sam Mathews in June and July 2014, through the efforts of John Kunicky, Brian Fritz, Meghann Ledford, Janet Storer, and Paula Hutson, even to the point of escalating the matter to John Kunicky's level in Human Resources, and to Brian Fritz' level in Finance.  *Kunicky Affidavit*

*¶ 23, [App 83].*

82.     John Kunicky believed that Sam Mathews was unable or unwilling to recognize the problems in his job performance and behavior, and to turn his performance around, and get past the conflict with Janet Storer.   Basically, Sam Mathews turned this whole unfortunate episode into an obsession with his dislike for Janet Storer, and Mathews thwarted any opportunity he might otherwise have had to rehabilitate his job performance and behavior and save his job.   *Kunicky Affidavit ¶ 23, [App 83].*

83.     John Kunicky believed, based on all the correspondence and other documents Kunicky reviewed, including the materials submitted by Sam Mathews, Kunicky's conversations and meetings on the matter, and Kunicky's observations of the individuals involved, that Mathews was not performing his job effectively, he had become a severe detriment to his manager and the department, and he was not willing to conform his behavior or cooperate to improve his performance or try to get along with his manager.   Kunicky concluded there was an irreparable conflict, and that Sam Mathews' employment had to be terminated, and Kunicky advised Brian Fritz of those conclusions and belief.   *Kunicky Affidavit ¶ 24, [App 83-84].*

84.     Same Mathews never indicated to John Kunicky that Mathews believed Janet Storer or anyone else at UPP was discriminating against Mathews on account of his age or national origin, or on any other basis other than personal conflict or their belief that Mathews was not performing as expected.   *Kunicky Affidavit ¶ 25, [App 84].*

85.     John Kunicky never met Sam Mathews, and never knew Mathews real first name until Kunicky learned about it in connection with this lawsuit.   Kunicky just thought Mathews' first name was "Samuel" and "Sam" because that is what Mathews went by at work and what everyone called Mathews when talking to Kunicky.   Kunicky had no idea Mathews was not born

in the United States and no idea what Mathews' age was at the time, and nobody, including Janet Storer, ever mentioned Mathews' national origin or race or age to Kunicky, or even alluded to it. Kunicky also never spoke with Mathews on the phone, so Kunicky was not aware that Mathews speaks with an accent that suggests he is not originally from the United States.  *Kunicky Affidavit ¶ 26, [App 84]*.

86.     None of Brian Fritz's actions or decisions involving Sam Mathews' were based on Mathews' national origin or his age, but were based on Fritz's business judgment, based on the information and advice Fritz received, and Fritz's own observations, conversations, and document review.  *Fritz Affidavit ¶ 55, [App 14]*.

87.     Janet Storer never took any action or made any decisions involving Sam Mathews based on his national origin or his age.  Storer's decisions, actions, and comments were always based on her business judgment about what was best for her department and the employees in her department, including Sam Mathews, and for UPMC generally.  *Storer Affidavit ¶ 27, [App 155]*.

88.     At no time did Sam Mathews say or even suggest to Brian Fritz that Storer was biased against Mathews based on Mathews' age or national origin, or on any other unlawful basis, or based on anything other than Storer's view that Mathews was not performing to expectations. *Fritz Affidavit ¶ 56, [App 14]*.   In addition, Brian Fritz never witnessed or suspected at any time that unlawful discrimination was at work in Sam Mathews' discharge or the events leading up to it.  *Fritz Affidavit ¶ 56, [App 14]*.

Respectfully submitted this 10th day of March, 2017.

/s/ *William S. Myers*

John J. Myers (Pa. ID 23596)
William S. Myers (Pa. ID 38565)

Eckert, Seamans, Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219
412-566-6000 (telephone)
412-566-6099 (facsimile)

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

KUZHIKALAYIH MATHEWS
aka Samuel "Sam" Mathews,

                Plaintiff,

v.

UNIVERSITY OF PITTSBURGH PHYSICIANS
aka UPP, INC,

                Defendant.

Case No. 2:16-CV-1148-MAK

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing **Defendant's Concise Statement of Material Facts in Support of Motion for Summary Judgment** will be served on the following counsel for Plaintiff on **March 10, 2017,** by operation of the Court's electronic filing system.

> Rolf Louis Patberg, Esquire
> Patberg, Carmody & Ging
> Deutschtown Center
> 801 Vinial Street, Third Floor
> Pittsburgh, Pennsylvania   15212

> /s/ *William S. Myers*
> _____
> William S. Myers