# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| KUZHIKALAYIH MATHEWS | : | CIVIL ACTION |
| Aka SAMUEL "SAM" MATHEWS | : | |
| | : | |
| v. | : | |
| | : | NO. 16-1148 |
| UNIVERSITY OF PITTSBURGH | : | |
| PHYSICIANS aka UPP, INC. | : | |

**KEARNEY, J.** April 13, 2017

## MEMORANDUM

We again review a supervisor's email previewing a decision to fire a long-time employee with alleged performance issues before the employer can line up its legitimate business reasons. When challenged for employment discrimination based on the fired employee's national origin or age, the employer must scramble to overcome its supervisor's email evincing a judgment before gathering facts. These inconsistent grounds for firing the employee create issues of fact as to whether the later defined business reasons are pretext for discrimination. When the employee adduces a *prima facie* case of national origin or age discrimination combined with the supervisor's preliminary determination documented in perpetuity in an email contrary to its business reasons, we must allow our jury to evaluate the credibility of the employer's stated business reasons. In the accompanying Order, we deny the employer's motion for summary judgment as to the discrimination claims but dismiss hostile work environment claims.

### I. Undisputed Material Facts.[1]

University of Pittsburgh Physicians ("Physicians") provides healthcare services through physician practice groups in various medical specialties.[2] In late 2001, Physicians hired Kuzhikalayih "Sam" Mathews, a Singapore native,[3] to work as a financial analyst.[4] In 2009, Mr.

Mathews began working under Paula Hutson in the Pediatrics Department.[5] Physicians gave Mr. Mathews positive performance reviews. On July 29, 2014, however, Physicians terminated 61-year old Mr. Mathews after putting him on a 45-day performance improvement plan.[6] Mr. Mathews claims Physicians' alleged deficient performance reasons to fire him are pretext for national origin and age discrimination and hostile work environment.

### A. UPMC restructured its finance groups in 2013.

Physicians is an organization within the University of Pittsburgh Medical Center ("UPMC"). Before 2013, UPMC's financial analysts worked in separate units reporting only to the units they served.[7] In April 2013, UPMC restructured the finance function across its organizations by consolidating and centralizing it into a single organization serving various departments.[8] UPMC expected to eliminate a number of financial analyst positions, and it required its financial analysts to reapply and interview for positions.[9]

The restructuring consolidated the finance groups of Physicians' Pediatrics Department and Orthopedic Surgery Department.[10] Janet Storer served as the Manager of Finance in this consolidated group.[11] After interviewing Mr. Mathews, Ms. Storer hired Mr. Mathews in April or May 2013.[12] Ms. Storer reported to her supervisor Brian Fritz who had overall responsibility for all of Physicians' finances in the clinical department.

### B. Mr. Mathews' difficult working relationship with supervisor Ms. Storer.

Mr. Mathews had a difficult working relationship with his supervisor, Ms. Storer. From January through May 2014, Ms. Storer swears she had ongoing problems with Mr. Mathews' job performance and his behavior toward her, claiming he behaved argumentatively, uncooperatively, and sometimes dishonestly about his job duties.[13] Ms. Storer swears Mr. Mathews "always seemed to have an excuse or explanation, but it always seemed to miss the

main point of what I was trying [to] get him to do or not to do."[14] She explains, "[I]t took an inordinate amount of my time and energy just to try to show him he was missing the point but also to fend off his anger and vehemence."[15] Ms. Storer described Mr. Mathews' anger as "frightening" and "so intense that he would be visibly trembling."[16] Ms. Storer swears she feared for her safety on one or two occasions.[17] Ms. Storer discussed these issues with her supervisor, Mr. Fritz, on a regular basis.[18]

Mr. Mathews also identifies issues he had with Ms. Storer. He claims from January through July 2014, Ms. Storer engaged in conduct which he characterizes as constituting a hostile work environment.[19] Mr. Mathews swears Ms. Storer: (1) denied him information he needed to do his tasks, including information required to complete a Profit and Loss; (2) created obstacles to his tasks; (3) prohibited him from communicating with others in the department who could provide him with necessary information; (4) required him to channel his queries through her but then chided him for not using his own initiative to find information; (5) "thwarted [him] in every fashion"; (6) "disparaged every move [he] made"; and (7) "presented [him] with a hostile demeanor."[20]

Mr. Mathews' working relationship with Ms. Storer included a partially disputed May 9, 2014 incident. In a May 12, 2014 email, Ms. Storer told her boss Mr. Fritz and Mr. Mathews' former boss Ms. Hutson about a May 9 meeting with Mr. Mathews.[21] Ms. Storer said she met with Mr. Mathews, who was angry and felt he had not been given a chance to learn certain tasks.[22] Ms. Storer told them Mr. Mathews said he had excellent reviews, "mentioned his age," mentioned he and his wife were sick, and "screamed" he would file a grievance with human resources.[23] In the email, Ms. Storer explained she felt "somewhat threatened" by one of Mr. Mathews' statements claiming Ms. Storer was "persecuting him and that he would like to speak

to [her] outside of work."[24] Ms. Storer also explained to Mr. Fritz and Ms. Hutson several performance-related issues she had with Mr. Mathews.[25]

Mr. Mathews, however, claims during the meeting he asked Ms. Storer "civilly" if she could confine her criticism of him to private offices instead of publicly berating him in front of his coworkers.[26] Mr. Mathews swears he never "physically threatened" Ms. Storer.[27] With regard to the age reference, Mr. Mathews told Ms. Storer, "I am a grown man, that I'm 61 years of age and that you're treating me like a child."[28] Mr. Mathews asked Ms. Storer if she had animosity toward Mr. Mathews because of his color.[29]

### C. Mr. Fritz refers to Mr. Mathews as a cancer who needs to be terminated, and a day later Physicians places him on a performance improvement plan.

Later on May 12, 2014, Ms. Storer emailed Mr. Fritz about the May 9th meeting, Mr. Fritz emailed Human Resources Director John Kunicky asking for guidance on how to terminate Mr. Mathews, referring to him as a cancer:

> We are having issues with a [sic] employee in the Ortho/Peds pod. The current (past 6 months specifically) is complicated as the previous manager (also his current manager Paula Hutson) failed to manage him and do an appropriate evaluation. Janet who is the Manager of the department is now dealing with issues. We all agree he is a cancer to the department and need to terminate [sic] we need your guidance on how to do so appropriately.[30]

The following day, Mr. Fritz emailed Ms. Hutson stating Mr. Mathews would undergo a performance improvement plan ("PIP").[31] Mr. Fritz admonished Ms. Hutson for not earlier dealing with Mr. Mathews' apparent issues: "As [Mr. Mathews] is a direct report of yours a lot of these issues in which Janet is now dealing should have been addressed by you."[32] He continued, "We are far beyond using reorganization as an excuse for anything and in the midst of continued change which is the new norm. We are focusing on value added activities and development of our staff in which I see the opposite here."[33] Mr. Fritz told Ms. Hutson she

would play a role in managing Mr. Mathews to achieve the PIP "and becoming a viable member of the team and helping us progress or he will no longer be part of the team."[34]

Mr. Fritz and Mr. Kunicky spoke by telephone on several occasions over the following months about the conflict and performance issues Ms. Storer had with Mr. Mathews.[35] Mr. Kunicky discussed this matter with his direct report, human resources consultant Meghann Ledford, who had also been working on the matter.[36] Mr. Kunicky asked Ms. Ledford to solicit and gather documents and other materials from Mr. Mathews, Ms. Storer, Ms. Hutson, and others so Mr. Kunicky could review the matter independently and be able to advise Mr. Fritz on how to handle the situation.[37] Ms. Ledford admits she did not give Mr. Mathews the opportunity to share his side of the story before Physicians placed him on the PIP.[38]

Over the course of the next few weeks, Ms. Storer worked with Ms. Ledford on several drafts of a written PIP document.[39] Mr. Fritz and Mr. Kunicky reviewed and edited these drafts, and Ms. Hutson provided her input as well.[40]

### D. Physicians place Mr. Mathews on a PIP.

On June 12, 2014, despite Mr. Fritz's reference to Mr. Mathews as a cancer to be terminated, Physicians placed Mr. Mathews on a PIP for a 45-day period.[41] The PIP provided Ms. Hutson and Ms. Storer would meet with Mr. Mathews on a weekly basis to discuss his progress.[42] If Mr. Mathews failed to improve his performance under the PIP, he could be terminated.[43]

When Ms. Storer met with Mr. Mathews to discuss the PIP, Mr. Mathews reacted "angrily and argumentatively" to the issues addressed in the PIP.[44] Mr. Mathews saw many factual inaccuracies in the PIP and proceeded to write a response.[45] Mr. Mathews claims the PIP did not clarify how he would be evaluated during the PIP.[46]

5

### E. Mr. Mathews' meeting with Mr. Fritz regarding the PIP.

Mr. Mathews requested a meeting with Mr. Fritz to discuss the PIP, stating he believed "a significant amount of confusion has been sowed."[47] Mr. Fritz responded although he supported the PIP, he would schedule a meeting to discuss "improvement points" with Mr. Mathews but not to discuss his challenges to the plan.[48] Mr. Mathews responded he did not intend to challenge anything in the PIP, but sought to "fill in some critical facts that were omitted" and to discuss the metrics Physicians would use to measure his performance.[49]

After Mr. Fritz received Mr. Mathews' email, he emailed Ms. Storer and Ms. Ledford, stating he would be glad to meet with Mr. Mathews but would be "wary to do so without others present" because his interactions with Mr. Mathews "have led me to correlate him to a used car salesman and only out for his own good. By meeting with me I would guess he has more than one motive."[50]

Later that month, shortly after the PIP began, Mr. Mathews met with Mr. Fritz and provided him written materials defending each point addressed in the PIP.[51] Mr. Mathews defended his prior conduct and requested a clearer articulation of the metrics which would be used to address his performance.[52] Mr. Fritz, however, swears Mr. Mathews appeared "almost obsessed with arguing over details that were not important to his overall performance deficiencies."[53] Mr. Fritz came away from the meeting "with the clear impression that [Mr. Mathews] was not trying to improve his performance, but was trying to prove Janet Storer wrong—that it had become a personal contest for [Mr. Mathews] and [Ms. Storer].[54] Mr. Fritz explains Mr. Mathews "was completely missing the larger point of the PIP, which was for him to learn to cooperate with his manager and get his projects done properly and timely—and without burdening his manager or others with having to help him do his job."[55]

### F. Mr. Mathews' PIP meetings with Management.

Mr. Mathews had a series of meetings with management during the PIP period, including a meeting on July 9, 2014 documented by Ms. Hutson, Ms. Storer, and Ms. Ledford in emails sent to management. The meeting did not go well for Mr. Mathews. Ms. Hutson described the meeting as "very uncomfortable" and "unproductive," and she noted Mr. Mathews' strained relationship with Ms. Storer.[56]

According to Ms. Storer, Mr. Mathews' anger frightened her, and she noted Mr. Mathews "records everything I say and do much like a stalker." Ms. Storer told Mr. Fritz she felt "bullied," and she feared Mr. Mathews would harm her.[57] Ms. Storer mentioned Mr. Mathews "is not working towards being a productive member of our team. [He] is angry and would rather document and argue then move forward."[58]

Ms. Ledford recalled Mr. Mathews as being "loud and yelling at times because he is frustrated that he was even placed on a PIP and doesn't feel that [Ms. Storer] is giving him the proper training he needs to succeed."[59] After hearing about this meeting, Mr. Fritz suggested discharging Mr. Mathews before the conclusion of the PIP, possibly for insubordination.[60]

Ms. Ledford met with Mr. Mathews two days later and told him "his behavior can't continue and that he must be respectful."[61] Mr. Mathews apologized several times, but said he felt Ms. Storer targeted him.[62] Ms. Ledford spoke with Ms. Storer after this meeting and told her she did not have problems with Mr. Mathews.[63] Ms. Storer "seemed surprised by this and feels that we are giving him false hope."[64] Ms. Storer nonetheless agreed to continue meeting with Mr. Mathews.[65]

### G. Mr. Fritz discharges Mr. Mathews.

On July 29, 2014, Mr. Fritz discharged Mr. Mathews.[66] Mr. Fritz explains he did so because Mr. Mathews either (a) "never accepted the PIP was needed, so he refused to cooperate in it," or (b) Mr. Mathews "was not capable of doing what was being asked, so he masked that inability by being argumentative and hostile with" Ms. Storer.[67] Physicians replaced Mr. Mathews with Ms. Walsh, who is Caucasian.[68]

### H. Alleged discriminatory statements.

Mr. Mathews alleges two incidents in which Ms. Storer allegedly made discriminatory statements, and he argues these statements are relevant to his national origin discrimination and hostile work environment claims. We refer to these statements as the America's favorite past-time statement and the Indian statement.

#### i. America's favorite past-time statement.

During the PIP period, Ms. Storer made a comment to Mr. Mathews which could be suggestive of national origin bias. On June 19, 2014, Ms. Storer asked Mr. Mathews whether he would be going to a Pittsburgh Pirates baseball game, and he said no.[69] Ms. Storer responded in a tone Mr. Mathews perceived to be discriminatory, stating she was "not surprised" he would not be attending the Pirates game, "America's [emphasized in tone] favorite past time."[70]

#### ii. Indian statement.

At a meeting at some point between February 2014 and July 2014, Ms. Storer repeated the hearsay statement of a coworker which mentioned a coworker's national origin.[71] During the meeting, Ms. Storer restated the statement of employee, Dr. Fu, who said another employee, Naveed Ismail, "had suggested that [Dr. Fu] was a snazzy dresser and that he [Mr. Ismail] wouldn't have any trouble working with an Indian like that."[72]

## II. Analysis

Mr. Mathews sued Physicians for age and national origin discrimination, hostile work environment, and retaliation under the Age Discrimination in Employment Act of 1967,[73] Title VII of the Civil Rights Act of 1964,[74] and the Pennsylvania Human Relations Act ("PHRA").[75] Physicians moves for summary judgment, arguing Mr. Mathews' claims fail as a matter of law.[76]

### A. Mr. Mathews adduces evidence of age discrimination.[77]

To prevail under the ADEA, Mr. Mathews must prove "but for" his age, he would not have suffered an adverse employment action.[78] To survive summary judgment, Mr. Mathews may present direct evidence demonstrating age constituted the but-for cause of the decision or demonstrate pretext under the familiar *McDonnell Douglas*[79] burden shifting framework. Physicians argues Mr. Mathews fails under both methods. We find there is sufficient evidence under the *McDonnell Douglas* framework to find Physicians' proffered explanation for terminating Mr. Mathews is pretextual.

Under the *McDonnell Douglas* framework, if Mr. Mathews establishes a *prima facie* case, the burden shifts to Physicians to proffer evidence of legitimate non-discriminatory reasons for its adverse employment actions.[80] "The defendant satisfies its burden at this step by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable action."[81] Once satisfied, Mr. Mathews must then show, by a preponderance of the evidence, Physicians' explanation is "pretextual."[82]

Physicians does not challenge Mr. Mathews' *prima facie* case. Mr. Mathews argues Physicians fails to articulate a legitimate, nondiscriminatory reason for discharging Mr. Mathews. This argument fails. "The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need

not prove that the articulated reason actually motivated the discharge."[83] Physicians satisfies this burden, as demonstrated by Mr. Fritz's explanation Mr. Mathews' either (a) never accepted the necessity of the PIP and refused to cooperate in it, or (b) lacked the capability to do the work and masked his inability with argumentativeness and hostility toward Ms. Storer.[84]

As Physicians satisfies its burden, Mr. Mathews must: (a) adduce evidence allowing a factfinder to disbelieve Physicians' reasons; or (b) point to evidence allowing a factfinder to believe an invidious discriminatory reason more likely than not constituted a "determinative cause" Physicians' conduct.[85] "To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."[86]

There is sufficient evidence allowing a reasonable jury to disbelieve Mr. Fritz's explanation for terminating Mr. Mathews. Within hours of Physicians deciding to institute the PIP, Mr. Fritz sent an email to Mr. Kunicky in Human Resources stating "all agree" Mr. Mathews is a "cancer to the department and need to terminate."[87] Mr. Fritz's statement casts doubt on whether he ever intended to give Mr. Mathews a chance under the PIP. A reasonable jury could find the PIP to be a sham. We recognize Mr. Fritz's later emails regarding a PIP, but there is a question of credibility as to whether Mr. Fritz already decided to fire Mr. Mathews under the PIP. If so, a jury must explore why. Although Mr. Mathews adduces sufficient evidence to withstand summary judgment, he retains the ultimate burden at trial of proving intentional discrimination, *i.e.* "age was a determinate factor" in UPP's decision.[88] We accordingly deny Physicians' motion for summary judgment as to Mr. Mathews' age claims.

### B. Mr. Mathews adduces evidence of national origin discrimination.[89]

To prevail on a claim for national origin discrimination, Mr. Mathews must present evidence allowing a reasonable jury to conclude his national origin "was a motivating factor" in Physicians' decision to discharge him.[90] Mr. Mathews can prove his case with direct evidence of discrimination or under the *McDonnell Douglas* pretext analysis.[91] Physicians argues Mr. Mathews fails under both methods.

To establish a *prima facie* case of national origin discrimination, Mr. Mathews must show: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.[92] Physicians argues Mr. Mathews does not satisfy the fourth requirement.

Mr. Mathews provides sufficient evidence giving rise to the inference of discrimination. Replacement by an individual outside the protected class is sufficient to establish an inference of discrimination.[93] Physicians replaced Mr. Mathews with Ms. Walsh, who is Caucasian.[94] Mr. Mathews accordingly satisfies this requirement of his *prima facie* case.

Physicians also argues Mr. Mathews cannot demonstrate pretext. We find sufficient evidence of pretext in Mr. Fritz's pre-PIP email referring to Mr. Mathews as a cancer who needed to be terminated. A jury must weigh the business reason in light of Mr. Fritz's emailed predetermined finding.

### C. Mr. Mathews' adduces evidence of unlawful retaliation.

Physicians assumes for the purposes of summary judgment Mr. Mathews meets the requirements of a *prima facie* case of retaliation. Physicians argues, however, Mr. Mathews

cannot establish pretext. We again find sufficient evidence of pretext in Mr. Fritz's pre-PIP email referring to Mr. Mathews as a cancer who needed to be terminated.

### D. Mr. Mathews does not adduce evidence of a hostile work environment.

Physicians argues Mr. Mathews cannot establish a claim for hostile work environment. To prove hostile work environment based on age or national origin, Mr. Mathews must prove (1) he suffered intentional discrimination because of his age or national origin; (2) he suffered severe or pervasive discrimination; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in similar circumstances; and (5) the existence of *respondeat superior* liability.[95]

For summary judgment purposes, Physicians contends Mr. Mathews cannot satisfy the first or second elements. To determine whether an environment is severe or pervasive, we must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[96] "It is well-settled that being closely supervised or watched does not constitute an adverse employment action that can support a hostile work environment claim, and that having one's work micromanaged may be unpleasant but does not give rise to a hostile environment claim."[97] "[T]he 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"[98] This analysis "must concentrate not on individual incidents, but on the overall scenario."[99]

Mr. Mathews swears from January through July 2014, Ms. Storer engaged in conduct which he characterizes as constituting a hostile work environment, stating Ms. Storer: (1) denied him information he needed to do his tasks, including information required to complete a Profit

and Loss; (2) created obstacles to his tasks; (3) prohibited him from communicating with others in the department who could provide him with necessary information; (4) required him to channel his queries through her but then chided him for not using his own initiative to find information; (5) "thwarted [him] in every fashion"; (6) "disparaged every move [he] made"; and (7) "presented [him] with a hostile demeanor."[100]

Mr. Mathews' sworn allegations suffer from many deficiencies. Many of his sworn allegations, including his contentions Ms. Storer created obstacles, thwarted him, disparaged him, and presented him with a hostile demeanor, are too conclusory to warrant consideration, as an "affiant must ordinarily set forth facts, rather than opinions or conclusions."[101] Likewise, Mr. Mathews swears Ms. Storer engaged in this conduct from January through July 2014, but he does not state how often this conduct occurred.

Considering the totality of the evidence, including non-conclusory sworn allegations and allegedly discriminatory statements, Mr. Mathews did not endure severe or pervasive harassment. By way of analogy, in *Priest v. Felcor Lodging Trust*, the district court found insufficient evidence of a hostile work environment where the plaintiff alleged her supervisor, Mitchell: (a) treated the plaintiff "in a demeaning and unprofessional manner"; (b) changed the reporting structure, requiring the plaintiff to report to a male coworker she did not get along with; (c) told the plaintiff to communicate with the male coworker only through Mitchell; (d) ignored or dismissed the plaintiff when she tried to converse with him; (e) told the plaintiff her hard work did not mean she was smart; (f) called her "sunshine"; (g) hit her on the top of her head with rolled up paper, punched her on the arm, and smacked her on the back; and (h) "showed preferential treatment" to the male coworker.[102] We similarly conclude the conduct Mr.

Mathews endured does not rise to the level of an objectively hostile or abusive work environment.

### III.     Conclusion

We grant Physicians' motion for summary judgment as to Mr. Mathews' claims for hostile work environment based on age and national origin. We deny Physicians' motion in all other respects.

---

[1] We consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to" Mr. Mathews, "the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). Our Policies require a Statement of Undisputed Material Facts be filed in support of a Rule 56 motion, as well as an appendix of exhibits. Physicians filed its Statement of Undisputed Material Facts at ECF Doc. No. 35. Physicians filed an appendix at ECF Doc. No. 36. Mr. Mathews responded to the Physicians' Statement of Undisputed Material Facts at ECF Doc. No. 50. Mr. Mathews added documents to the Appendix at ECF Doc. No. 48. Mr. Mathews provided a Statement of Undisputed Material Facts at ECF Doc. No. 46. Physicians responded to Mr. Mathews' Statement of Undisputed Material Facts at ECF Doc. No. 51. References to the exhibits in the appendices shall be referred to by bates number, for example, "Appx. 1."

[2] ECF Doc. No. 50, ¶ 5.

[3] Appx. 933.

[4] ECF Doc. No. 50, ¶ 1.

[5] *Id.*

[6] Appx. 933, ¶¶ 5–6.

[7] ECF Doc. No. 50, ¶ 6.

[8] *Id.*

[9] ECF Doc. No. 50, ¶ 9.

[10] ECF Doc. No. 50, ¶ 10.

[11] ECF Doc. No. 50, ¶ 2.

[12] ECF Doc. No. 50, ¶ 12.

[13] Appx. 152, ¶ 13.

[14] Appx. 152, ¶ 14.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] Appx. 152, ¶ 15.

[19] Appx. 935, ¶ 19.

[20] Appx. 935, ¶¶ 19–20; Appx. 934, ¶ 13.

[21] Appx. 19.

[22] *Id.*

[23] *Id.*

[24] Appx. 21.

[25] Appx. 19.

[26] Appx. 935, ¶ 15.

[27] *Id.*

[28] Appx. 193.

[29] *Id.*

[30] Appx. 27; ECF Doc. No. 50, ¶ 3.

[31] Appx. 24.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] Appx. 80, ¶ 4.

[36] Appx. 80, ¶ 5; ECF Doc. No. 50, ¶ 36.

[37] Appx. 80, ¶ 5; ECF Doc. No. 50, ¶ 36.

[38] Appx. 290.

[39] Appx. 153, ¶ 18.

[40] *Id.*

[41] Appx. 32.

[42] Appx. 34.

[43] *Id.*

[44] Appx. 153, ¶ 19.

[45] Appx. 937, ¶ 36.

[46] Appx. 937–38, ¶ 36.

[47] Appx. 995.

[48] Appx. 994.

[49] *Id.*

[50] Appx. 37.

[51] Appx. 11, 997–99.

[52] Appx. 997.

[53] Appx. 11, ¶ 44.

[54] Appx. 11, ¶ 45.

[55] *Id.*

[56] Appx. 49.

[57] Appx. 46.

[58] Appx. 47.

[59] Appx. 93.

[60] *Id.*

[61] Appx. 99.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] Appx. 13, ¶ 52; Appx. 933, ¶¶ 5–6.

[67] Appx. 13, ¶ 52.

[68] ECF Doc. No. 51, ¶ 114; Appx. 934, ¶ 6.

[69] Appx. 943, ¶ 71; Appx. 171–72, at pp. 57:21–58:05.

[70] Appx. 171–72, at pp. 57:21–58:05.

[71] Appx. 172, at p. 59.

[72] Appx. 172, at p. 59.

[73] 29 U.S.C. § 621 *et seq.*

[74] 42 U.S.C. § 2000e *et seq.*

[75] 43 P. S. § 951 *et seq.*

[76] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, "we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Mancini v. Northampton Cnty.*, 836 F.3d 308,

313 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their care for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[77] We treat Mr. Mathews' PHRA age discrimination claims as coextensive with his ADEA claims because the parties do not point to textual differences requiring different interpretations. *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (quoting *Slagle*, 435 F.3d at 265 n.5).

[78] *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009).

[79] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[80] *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (citation omitted).

[81] *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)) (quotation marks omitted).

[82] *Id.*

[83] *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997) (citing *Fuentes*, 32 F.3d at 763).

[84] Appx. 13, ¶ 52.

[85] *Willis*, 808 F.3d at 645 (quoting *Fuentes*, 32 F.3d at 764).

[86] *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

[87] Appx. 27; ECF Doc. No. 50, ¶ 3.

[88] *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir. 1987) (en banc).

[89] We treat Mr. Mathews' PHRA national origin discrimination claims as coextensive with his Title VII national origin claims because the parties do not point to textual differences requiring different interpretations. *Burton*, 707 F.3d at 432 (quoting *Slagle*, 435 F.3d at 265 n.5).

[90] *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003)).

[91] *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 351 (3d Cir. 1999).

[92] *Makky*, 541 F.3d at 214.

[93] *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007).

[94] ECF Doc. No. 51, ¶ 114; Appx. 934, ¶ 6.

[95] *See Slater v. Susquehanna Cty.*, 465 F. App'x 132, 138 (3d Cir. 2012) (assuming standards for age-based discrimination are the same as the Title VII hostile work environment standards); *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (setting for the standard for hostile work environment under Title VII).

[96] *Id.* at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

[97] *Ciecka v. Cooper Health Sys.*, No. 15-4075, 2017 WL 656727, at *10 (D.N.J. Feb. 14, 2017) (quoting *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 423 (D.N.J. 2009)) (brackets omitted).

[98] *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

[99] *Mandel*, 706 F.3d at 168 (quoting *Caver*, 420 F.3d at 262–63).

[100] Appx. 935, ¶¶ 19–20; Appx. 934, ¶ 13.

[101] *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985) (quoting *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 789–90 (3d Cir. 1978)) (quotation marks omitted).

[102] *Priest v. Felcor Lodging Trust, Inc.*, No. 05-1181, 2006 WL 2709386, at *7 (W.D. Pa. Sept. 20, 2006).